1

2    **Entered on Docket**
    **June 29, 2005**                    _Bruce A. Markell_
                                         _____
3                                        **Hon. Bruce A. Markell**
                                         **United States Bankruptcy Judge**

4 _____

5                    UNITED STATES BANKRUPTCY COURT

6                          DISTRICT OF NEVADA

7                              * * * * * *

8   In re:                          )    BK-S-02-20472-BAM
                                     )    Chapter 11
9   PURCHASEPRO.COM, INC., a Nevada  )
    Corporation,                     )
10                                   )
              Debtor.                )
11  _____  )
                                     )
12  TODD LEHTONEN, as Trustee of the )    Adv. Proceeding No.: 04-1280-BAM
    PURCHASEPRO.COM LIQUIDATING      )
13  TRUST                            )
                                     )
14            Plaintiff,             )
                                     )
15  vs.                              )    Date: June 10, 2005
                                     )    Time: 1:30 p.m.
16  TIME WARNER, INC., a Delaware    )
    Corporation,                     )
17                                   )
              Defendant.             )
18  _____  )

19

20           **OPINION DENYING MOTION TO DISMISS**

21        Time Warner, Inc. ("TW") has moved to dismiss the second amended complaint of Todd

22  Lehtonen, as Trustee of the PurchasePro.com Liquidating Trust ("PPLT"). TW contends that none

23  of PPLT's four claims for relief state a valid claim against it. After an overview of some

24  complicated facts, the court disagrees and denies the motion.

25                          **I.  Background**

26        PPLT is what is left of the high-flying Internet "dot com" company, PurchasePro.com, Inc.

("PP").  PP crashed and burned in early 2002, and is now in the mop-up phase of its business life. In October 2004, it confirmed a liquidating plan of reorganization under which all of its pending avoiding powers actions, including the present action, were transferred to PPLT.[1]

The prepetition relationship between PP and America Online, Inc. ("AOL")[2] is at the heart of this action.   At one time, the parties viewed their relationship as a key strategic partnership, with PP supplying an efficient business-to-business marketplace portal, to which AOL would direct customers.   But the bubble burst, and PP's business prospects and share price plummeted — and fast.

In addition, it has since come to light that AOL committed fraud during the relationship. This fraud was sufficiently broad and wide-reaching to cause the Department of Justice to investigate.  The result of that investigation was an agreement under which AOL paid $60 million as a criminal penalty, $300 million as a civil penalty under the Sarbanes-Oxley Act, and $150 million into a fund for defrauded stockholders (of which some $30 million is earmarked to pay damages caused by the dealings with PP).

PPLT's complaint concerns some of the transactions that are at the heart of the troubling relationship between AOL and PP.  In particular, three of  PPLT's claims for relief seek recovery based upon Nevada's version of the Uniform Fraudulent Transfer Act ("UFTA") based upon the circumstances surrounding the cancellation of a warrant dated March 15, 2000 (the "Original Warrant"), and the immediate reissuance of a new amended and restated warrant dated "as of" November 18, 2000 (the "Amended Warrant").  In addition, the second amended complaint adds a fourth claim for relief which alleges that AOL is liable under Nevada corporate law for a failure to

---

[1]Before TW filed its motion to dismiss,  PPLT had obtained an order under Rule 7025 substituting it for PP.

[2]The defendant, TW, is a successor to AOL.

2

1    provide  the full amount of the agreed-upon consideration required when AOL exercised its rights

2    under the Amended Warrant.

3          Against this background, TW has moved to dismiss.[3]

4                              **II.  Legal Analysis**

5          A.     *Standard Applicable to Motion to Dismiss*

6          TW has moved to dismiss this adversary proceeding under Bankr. R. 7012, which

7    incorporates Fed. R. Civ. Pro. 12(b)(6).  The standard under Rule 12(b)(6) is high: the court must

8    take every well pleaded fact in the complaint as true, and it may then grant the motion only if it

9    appears beyond a doubt that PPLT can prove no set of facts that would entitle it to relief.  Zimmer v.

10   PSB Lending Corp. (*In re* Zimmer), 313 F.3d 1220, 1222 (9th Cir. 2002), *citing* Conley v. Gibson,

11   355 U.S. 41, 45-46 (1957).  In this context, a court must evaluate the legal feasibility of the

12   complaint, not the evidence that may be offered to support it.  Cooper v. Parsky, 140 F.3d 433, 440

13   (2d Cir. 1998).

14         B.     *TW's Basic Position*

15         TW acknowledges the high standard, but contends it has met it.  It asserts that the facts as

16   pleaded are indistinguishable from binding Ninth Circuit and Bankruptcy Appellate Panel authority.

17   Specifically, TW cites Decker v. Advantage Fund Ltd., 362 F.3d 593 (9th Cir. 2004) and Hansen v.

18   Finn (*In re* Curry & Sorensen, Inc.), 57 B.R. 824 (B.A.P. 9th Cir. 1986).

19         In *Decker*, the trustee in bankruptcy launched a fraudulent transfer attack on a sweetheart

20   stock deal.  The defendant, Advantage Fund Ltd., had purchased two series of convertible preferred

21   stock from the debtor, then an American Stock Exchange-traded company.  The conversion price of

22   the preferred stock was essentially set as a "floating 15% discount off the average daily low trading

23   price" of the debtor's common stock during the five days preceding the conversion.  *Id*. at 595.

24   _____

25         [3]TW moved to dismiss the original complaint for many of the same reasons set forth in its
     present motion.  The court granted that motion, but gave PPLT the ability to amend to see if it could
26   meet TW's objections.  The result was the second amended complaint at issue here.

Advantage Fund used this discounted conversion price formula to obtain $47 million worth of the debtor's common stock for an exercise price of only $40 million.  The trustee sued under Section 544(b), incorporating the California version of the UFTA for the $7 million discount.  The trustee alleged that the debtor had been insolvent at the time of the purchase, and that the debtor had not received reasonably equivalent value for the conversion.

The defendants claimed the preferred stock they received was not received by way of a transfer of "an interest of the debtor in property" as required by Section 544(b).  The Ninth Circuit agreed, finding that "unissued stock has no value to the *corporation*, as opposed to its *shareholders*, because stock only represents portions of equity in the corporation itself." *Id.* at 596 (italics in original).

The court relied upon *Curry & Sorensen* as its primary authority for the proposition that:

> A share of capital stock represents a unit of ownership interest and has no extrinsic value to the corporation itself. . . . Since an action directed at recovery of corporate stock could only affect equitable ownership of the corporation and would not restore property to the estate or avoid an estate obligation, then it is not a transfer subject to question under Section 548.

*Decker*, 362 F.3d at 596, *quoting In re* Curry & Sorensen, 57 B.R. at 829.

In *Curry & Sorensen*, creditors sued on behalf of the bankruptcy estate under Section 548 of the Bankruptcy Code.  They sought to set aside the prepetition issuance of 75,000 shares of capital stock of the debtor to its president.  Using the logic in the quotation above, the court found that capital stock cannot be property under Section 548 of the Bankruptcy Code,[4] since avoidance of the transfer would affect only the debtor's ownership, and would not increase assets for creditors, or reduce claims against the estate.

---

[4] Section 548 also requires that there be a "transfer of an interest of the debtor in property" before there can be avoidance.  *Decker* extended *Curry & Sorensen's* reading of that phrase in Section 548 to identical language found in Section 544(b).

4

Here, TW asserts that exercising its rights under either the Original Warrant or the Amended Warrant would have resulted only in a transfer of the common stock of PP. As a consequence, it contends that the inexorable logic of *Decker* and *Curry & Sorensen* dictate dismissal.

C.    *PPLT's Position*

PPLT takes several positions in response. One odd position deserves quick mention before it is dismissed: PPLT requests that this court ignore, or invent a pretext to distinguish, *Decker* and *Curry & Sorensen*. This court does not have the power or authority to ignore binding Ninth Circuit precedent. The rule of law and the doctrine of *stare decisis et non quieta movere* — meaning "to stand by and adhere to decisions and not disturb what is settled" — will not permit it. Hart v. Massanari, 266 F.3d 1155, 1170 (9th Cir. 2001) ("A district judge may not respectfully (or disrespectfully) disagree with his learned colleagues on his own court of appeals who have ruled on a controlling legal issue, or with Supreme Court Justices writing for a majority of the Court. . . . Binding authority must be followed unless and until overruled by a body competent to do so."); *see also* IRS v. Osborne (*In re* Osborne), 76 F.3d 306, 309 (9th Cir. 1996).

But *stare decisis* extends only to opinions containing facts that are not rightly distinguishable from the facts at hand. As stated by Judge Kozinski stated in *Hart*: "In determining whether it is bound by an earlier decision, a court considers not merely the 'reason and spirit of cases' but also 'the letter of particular precedents.' . . . This includes not only the rule announced, but also the facts giving rise to the dispute, other rules considered and rejected and the views expressed in response to any dissent or concurrence." *Hart*, 266 F.3d 1155, at 1170.

As PPLT sees it, both *Decker* and *Curry & Sorensen* are distinguishable under this standard because they involve different types of transactions. *Decker* and *Curry & Sorensen* involved fraudulent transfer attacks on the direct issuance by a corporation of its common stock to third parties. Here, by contrast, the attack is on the cancellation or modification of existing intangible contract rights.

If sustainable, this is a distinction with a legitimate difference.  In both *Decker* and *Curry &* *Sorensen*, a key reason for not finding "any transfer of an interest of the debtor in property" was that avoidance of the transaction would not add assets to the debtor's estate or reduce claims against it. Rather, avoidance of a stock issuance would simply rearrange the equity ownership of a failed business, much like rearranging deck chairs on the *Titanic*.

PPLT's complaint alleges that PP and AOL conspired to cancel and transfer the Original Warrant and issue a new one — the Amended Warrant — on terms that did not provide PP with reasonably equivalent value in the exchange.[5]

The terms of the Amended Warrant, it is alleged, were far more beneficial to AOL than to PP.  In particular, PPLT states that under the revised terms, AOL no longer had to pay cash to obtain PP stock.  Rather, they merely had to certify that they had provided, directed or referred certain amounts of revenue to PP.  In short, rather than paying money for PP stock, AOL simply had to certify that it had caused others to use and pay for a certain minimum level of PP's products and services.

To implement this change, the parties eliminated the cash strike price found in the Original Warrant, and a replaced it with a complicated revenue formula.  From filings with the Securities and Exchange Commission, made part of the complaint, it appears that representatives of both PP and

---

[5]PPLT's first and second claims for relief in its complaint adequately, although sloppily, state the necessary companion allegations under Nevada law.  In particular, PPLT alleges that PP was "about to engage in business or a transaction, for which any property remaining with the Debtor was unreasonably small capital."  *See* NRS § 112.180.1(b)(1) (which actually requires that the "remaining assets of the debtor [be] unreasonably small in relation to the business or transaction"; PPLT's formulation mistakenly adopts a similar element set forth in 11 U.S.C. § 548(a)(1)(B)(ii)(II)).  PPLT also alleges that PP "intended to incur, or believed or reasonably should have believed that it would incur, debts beyond its ability to pay as they became due or was otherwise insolvent or rendered insolvent."  *See* NRS §§ 112.180.1(b)(2); 112.190.1. TW has not challenged the sufficiency of these allegations.

1  AOL concocted this exchange transaction to cover up financial results that neither wanted known,
2  and to fraudulently boost AOL's revenues.[6]

3       Regardless of its origins, when coupled with AOL's later exercises, the issuance of the
4  Amended Warrant appears to have satisfied the immediate goals of the AOL/PP conspiracy.  The
5  complaint states that in January 2001, as a result of the exchange of warrants and the new vesting,
6  AOL exercised its rights under the Amended Warrant and obtained 1,875,436 shares of PP common
7  stock for no cash.  At the time, PP common stock was selling at $25.50 per share.  A second
8  exercise in March 2001 resulted in AOL acquiring another 1,122,278 shares of PP stock at a time
9  when the market price of PP common was $7.25.  As PPLT calculates it, since none of the
10 certifications lacked the taint of fraud, the net effect of the two transactions was that AOL was
11 unfairly enriched by approximately $57.7 million.

12       D.   *Analysis of the Competing Positions*

13            1.   <u>What Law Applies?</u>

14       The parties initially disagree on what law applies.  PPLT grounds its complaint entirely on
15 Nevada law, and thus contends that Nevada law, and only Nevada law, applies to its allegations.
16 TW counters that Nevada law is applicable only after it passes a federal standard.  With respect to
17 PPLT's claims under Nevada's version of the UFTA, TW correctly points out that Section 544(b)
18 enables estate representatives such as PPLT[7] to avoid only transfers of "an interest of the debtor in
19 property," as that term is understood under federal law.  With respect to PPLT's claims under the

---

21       [6]PP's stock price at the time of the cancellation and exchange was $16.88 per share.

22       [7]Although Section 544(b) grants standing only to a "trustee," a debtor in possession or other
23 estate representative may also have standing under that section, as well as under other avoiding powers
   provisions. *See* 11 U.S.C. § 1107(a) (debtor in possession has powers of trustee); Avalanche Maritime,
24 Ltd. v. Parekh (*In re* Parmetex, Inc.), 199 F.3d 1029, 1031 (9th Cir. 1999); Hansen v. Finn (*In re* Curry
   & Sorensen, Inc.), 57 B.R. 824, 827-28 (B.A.P. 9th Cir. 1986).  PPLT has standing under another
25 provision of the Code, however; they are the estate's representative under a provision of PP's
   confirmed plan of reorganization, and Section 1123(b)(3)(B) of the Bankruptcy Code expressly
26 authorizes such provisions.

fourth claim for relief relating to a failure to honor a stock subscription agreement, TW claims that

before PPLT may bring such claims, the rights sought to be vindicated must be "property" under

Section 541(a) of the federal Bankruptcy Code, and TW disputes that point. As a consequence, TW

argues, regardless of what a state defines as property or what state law considers a "transfer," the

ultimate tests of what is a "transfer" and what constitutes an "interest of the debtor in property" for

purposes of standing under Section 544(b) are federal issues.

TW is correct. As *Decker* makes clear, the language in Section 544(b) — the reference to an

"interest of the debtor in property" — is language in a federal statute, and thus should receive a

uniform federal interpretation. *Decker*, 362 F.3d at 596. But this victory is hollow. Courts have

uniformly held that the phrase "property of the debtor" in the avoidance powers is coextensive with

"property of the estate" as set forth in Section 541(a). Begier v. IRS, 496 U.S. 53, 58-59 (1990);

Warsco v. Preferred Technical Group, 258 F.3d 557, 564-65 (7th Cir. 2001). As the Supreme Court

has noted, "[i]n the absence of any controlling federal law, 'property' and 'interests in property' are

creatures of state law." *See* Barnhill v. Johnson, 503 U.S. 393, 398 (1992). *See also* Butner v.

United States, 440 U.S. 48, 55 (1979) ("Property interests are created and defined by state law.

Unless some federal interest requires a different result, there is no reason why such interests should

be analyzed differently simply because an interested party is involved in a bankruptcy proceeding.").

Given that the aim of avoiding powers such as those found in Section 544(b) is to give the

estate representative standing to bring creditor claims, the Ninth Circuit has stated that the term

"interest of the debtor in property" should be broadly construed. Danning v. Bozek (*In re* Bullion

Reserve of North America), 836 F.2d 1214, 1217 (9th Cir.), *cert. denied*, 486 U.S. 1056 (1988).

*See also* United States v. Battley (*In re* Kimura), 969 F.2d 806, 810 (9th Cir. 1992) (in context of

federal tax lien statute, defining property as "generally characterized as an aggregate of rights; 'the

right to dispose of a thing in every legal way, to possess it, to use it, and to exclude everyone else

from interfering with it.'") (*quoting* BLACK'S LAW DICTIONARY 1095 (5th ed. 1979)). It would thus

be odd for the language referring to property in Section 544(b) to be construed more narrowly than

1    the same term is construed under Section 541; otherwise, a debtor could limit the rights of its

2    creditors merely by filing bankruptcy, a consequence Congress certainly didn't contemplate when

3    drafting Section 544(b).[8]  As stated by the Supreme Court in a different context, "Uniform treatment

4    of property interests by both state and federal courts within a State serves to reduce uncertainty, to

5    discourage forum shopping, and to prevent a party from receiving 'a windfall merely by reason of

6    the happenstance of bankruptcy.'"  *Butner*, 440 U.S. at 55, *quoting* Lewis v. Manufacturers

7    National Bank, 364 U.S. 603, 609 (1961).

8         This analysis, however, begs the question of whether the transactions at issue here would be

9    avoidable by creditors under Nevada law.  *Decker* is authority for the proposition that an initial

10   issuance of stock is not a transfer under the UFTA, or at least California's version of the UFTA.  As

11   argued by PPLT, however, its amended complaint attacks different types of transactions.  In

12   particular, PPLT places in issue the transactions in which the Original Warrant was canceled and the

13   Amended Warrant issued in its place.  As both parties concede, there is no Nevada law directly on

14   point with respect to whether an issuer's interest in a stock warrant is property that can be

15   transferred within the meaning of Section 544(b).

16        That is not to say that there is no Nevada law.  Nevada's UFTA adopts the uniform structure

17   of allowing creditors (and derivatively, any estate representative in bankruptcy) to avoid certain

18   "transfers" of "assets."  A "transfer" under Nevada's UFTA is defined as:

19        [E]very mode, direct or indirect, absolute or conditional, voluntary or involuntary, of
     disposing of or parting with an asset or an interest in an asset, and includes payment

20        of money, release, lease, and creation of a lien or other encumbrance.

21

22

23

---

24        [8]Indeed, the rights an estate representative may assert under Section 544(b) are generally viewed

25   as derivative of state law claims, and to the extent creditors are under some disability or subject to
     some state law defense, the estate representative is similarly bound.  Heffron v. Duggins, 115 F.2d 519

26   (9th Cir. 1940).

NRS § 112.180.12.[9]  Transfers, in turn, relate to "assets," which are defined as "property of the debtor." *Id*. § 112.150.2.  "[P]roperty" means "anything that may be the subject of ownership." *Id.* § 112.150.10.  Since "[t]he shares of stock in every corporation shall be personal property . . . ", NRS § 78.240, it would seem that Nevada law might very well be different from the California law construed in *Decker*, and that transfers of shares from a corporation might properly be the subject of an action under Nevada's UFTA.

TW argues, however, that the while shares or warrants may very well be property in the hands of the shareholder, they are not property for the issuer.  In this regard, they properly raise the policy concerns outlined in *Decker* and in *Curry & Sorensen* to the effect that avoidance of a stock issuance can have no real effect on creditors.

## 2.    What is a Warrant?

But are the same concerns about stock issuance present when the transaction is the exchange of one warrant for another?  The issue resolves itself to whether the debtor's prepetition exchange of the Amended Warrant for the Original Warrant was a transfer "of an interest of the debtor in property."  This requires the court to analyze both the Original Warrant and the Amended Warrant.[10] To start the analysis, *Black's Law Dictionary* defines a stock warrant as follows:

> "4. Securities. An instrument granting the holder a long-term (usu. a five- to ten-year) option to buy shares at a fixed price. • It is commonly attached to preferred stocks or bonds. -- Also termed *stock warrant*; *subscription warrant*.

Black's Law Dictionary 1617 (Bryan A. Garner, ed., 8th ed. 2004).  Recent case law is in accord.  "'In corporate jargon, a warrant is an option to purchase stock at a given price.'" Carrieri v.

---

[9]The definition of "transfer" in the UFTA was derived from the language used in the 1978 revision of the Bankruptcy Code.  *See* Comment (12) to Section 1 of UFTA.

[10]Neither the Original Warrant nor the Amended Warrant is part of the amended complaint, but PPLT produced a copy of each with its opposition, and TW did not object to the provision of these documents at the hearing on the motion to dismiss.  While under the last sentence of Fed. R. Civ. Pro. 12(b) this addition technically converted the motion to dismiss into a summary judgment motion, no party objected, and the court has reviewed the allegations of the complaint as if the additional documents were not part of it.

Jobs.com, Inc., 301 B.R. 187, 193 (N.D. Tex. 2003), *quoting* Bradford v. Crown-Bremson Indus., Inc., 255 F. Supp. 1009, 1012 (M.D. Tenn. 1964). *See also* Breeden v. L.I. Bridge Fund, LLC (*In re The Bennett Funding Group, Inc.*), 232 B.R. 565, 568 n.3 (Bankr. N.D.N.Y. 1999); 11 U.S.C. § 101(16)(C) (defining equity security to include warrant).

The upshot of these definitions is that a warrant is just a fancy name for a particular type of contract. More specifically, it is an option contract giving its holder the right to purchase shares of stock for a fixed price. In this relationship, it is fairly clear that the holder of a warrant has a property right it can enforce through specific performance of the share issuance. *See, e.g.,* Chadwell v. English 652 P.2d 310 (Okl. App. 1982).

3.    <u>Does an Issuer of a Warrant Have a Property Interest in That Warrant?</u>

While it is not contested that AOL has property rights in the warrants, it *is* contested that PP had anything similar. TW asserts that PP had no property rights under either the Original Warrant or the Amended Warrant; it contends that a warrant is a unilateral contract under which the issuer has only nondelegable duties with no benefits.

But this is not quite accurate. A warrant intertwines the right to buy shares at a particular price with an obligation to pay that price upon exercise. In short, a warrant assures the issuer that it will receive whatever consideration the terms of the warrant provide. Such an assurance can be valuable — otherwise, why bargain for it?

Various strands of related law provide hints that this interest in a stock warrant can be property. Article 9 of the Uniform Commercial Code recognizes that the holder of an issued stock warrant holds property that can be encumbered by a consensual security interest, Mizuho Corporate Bank, Ltd. v. Enron Corp. (*In re* Enron Corp.), 302 B.R. 463, 467-68 (Bankr. S.D.N.Y. 2003). It also recognizes that the person granting an option can grant a security interest in its right to receive payment upon any exercise of that option; that is, an issuer could raise needed capital by giving a secured party a security interest in its rights under any outstanding warrants. *See* Uniform

Commercial Code § 9-102(a)(61) (definition of payment intangible).[11]  Case law also recognizes that

a holder may fraudulently transfer a stock warrant before, FmHA v. Indi-Bel, Inc. (*In re* Williams),

167 B.R. 77 (Bankr. N.D. Miss. 1994), or after, issuance.  Breeden v. L.I. Bridge Fund, LLC (*In re*

The Bennett Funding Group, Inc.), 232 B.R. 565 (Bankr. N.D.N.Y. 1999).  Finally, an

uncompensated release of a person's matured obligations under a stock subscription agreement may

be a transfer of a property interest under Section 544(b), Shear v. Seminara (*In re* PSI Indust., Inc.,

306 B.R. 377, 388-89 (Bankr. S.D. Fla. 2003) (under Florida's version of the UFTA).

From these propositions, it is a short trip to the conclusion that an issuer's rights under a

stock warrant are an "interest of the debtor in property" that may be the subject of a transfer.

Reciprocity alone would lead one to view it as odd if the owner of a warrant held property rights in

the expectations embodied therein, but the same classification was not true with respect to the rights

of the other party to the same contract — the issuer.  This notion of preserving reciprocal relations is

reflected in the policies behind the breadth of property interests under Section 541(a) discussed

above, and the polices behind the breadth of the concept of a "transfer."

    4.  <u>Scope of the Term "Transfer"</u>

The policy analysis regarding the scope of fraudulent transfer law starts with the fact that the

Bankruptcy Code defines "transfer" expansively.  Section 101(54) states:

> "Transfer" means every mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with property or with an interest in property, including retention of title as a security interest and foreclosure of the debtor's equity of redemption.[12]

---

[11]The court acknowledges that for something to be a payment intangible under Section 9-102(a)(61) it must first be a general intangible, § 9-102(a)(42), which requires the "something" to be "personal property."  But it is without doubt that the Original Warrant and the Amended Warrant both had provisions for exercise by present payment, and although those alternatives were not chosen by AOL, their presence would indicate that at least some rights under the warrants were property rights encompassed by the term "personal property."

[12]The current definition is substantially similar to the original form of the definition Congress adopted in 1978.  The only change made since 1978 to the definition was made six years later as part

This definition is broad and covers not only the everyday buying and selling of goods, but also the transfer of a partial interest or a transfer that is not accompanied by a change of possession. Congress intended this breadth, in order to provide the maximum protection of creditors. *See* H.R. REP. NO. 595, 95TH CONG., 1ST SESS. 314 (1977).

Similarly, the type of property interest that can be transferred is also expansive. A creditor's prepetition termination of an executory agreement, for example, may constitute a transfer of a property interest. *In re* Robotic Vision Systems, Inc., 322 B.R. 502, 508 (Bankr. D.N.H. 2005) (termination of technology license a transfer); Wallach v. Nowak (*In re* Sherlock Homes of W.N.Y., Inc.*), 246 B.R. 19, 24-25 (Bankr. W.D.N.Y. 2000) (renegotiation of contract altering debtor's rights and liabilities is a transfer); Lloyd McKee Motors, Inc., v. Chrysler Corp., 166 B.R. 725, 728 (Bankr. D.N.M. 1993) (termination of a franchise for a car dealership is a transfer); Metro Water & Coffee Servs. v. Rochester Community Baseball (*In re* Metro Water & Coffee Servs.), 157 B.R. 742, 745-46 (Bankr. W.D.N.Y. 1993) (termination of a concession agreement).

---

of the Bankruptcy Amendments and Federal Judgeship Act of 1984, Pub. L. No. 98-353, 98 Stat. 333 (1984). At that time, the definition of "transfer" was broadened to include the "foreclosure of the debtor's equity of redemption." *Id*. § 421(i).

Effective October 17, 2005, Congress changed the definition of transfer in ways that would seem to expand its scope even further. The new Section 101(54) will read:

(54) The term 'transfer' means—
    (A) the creation of a lien;
    (B) the retention of title as a security interest;
    (C) the foreclosure of a debtor's equity of redemption; or
    (D) each mode, direct or indirect, absolute or conditional, voluntary or involuntary, of disposing of or parting with—
        (i) property; or
        (ii) an interest in property.

Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, § 1201(6), 119 Stat. 23, 119 (2005).

As noted above in note 9, Nevada's version of the UFTA incorporates a broad definition of "transfer" based upon the original definition in the Bankruptcy Code.

13

Transfers have also been found when a transaction only modifies the form or the value of property transferred. *See* Ingalls v. Erlewine (*In re* Erlewine), 349 F.3d 205, 211 & n.7 (5th Cir. 2003) (divorce decree dividing marital property a transfer); *In re* Oliver, 44 B.R. 989, 991 (D. Mass. 1984) (a transfer occurred when the debtor and his wife changed their old common law tenancy by the entirety into one governed by a new statute under which the debtor gave up considerable interest in property in favor of his wife); Flatau v. Wachovia Sec. (*In re* Pulliam), 279 B.R. 916, 920-21 (Bankr. M.D. Ga. 2002) (rollover of funds from one individual retirement account to another was a transfer); Hall-Mark Elec. Corp. v. Sims (*In re* Ota), 179 B.R. 149 (B.A.P. 9th Cir. 1995) (delivery of cashier's check to payee was a transfer of the remitter's interest in the check); Kendall v. Sorani (*In re* Richmond Produce Co.), 151 Bankr. 1012, 1016-17 (Bankr. N.D. Cal. 1993), *aff'd*, 195 Bankr. 455 (N.D. Cal. 1996) (same). Even termination of esoteric rights such as a debtor's subchapter S tax status has been found to be a transfer. Parker v. Saunders (*In re* Bakersfield Westar, Inc.), 226 B.R. 227, 235 (B.A.P. 9th Cir. 1998); Trans-Lines West, Inc. v. Lines (*In re* Trans-Lines West, Inc.*, 203 B.R. 653, 662-63 (Bankr. E.D. Tenn. 1996).

Although broad, the term "transfer" does have limits. In addition to *Decker* and *Curry & Sorensen* holdings on stock issuance, courts have also struggled with the issue of whether lease terminations are transfers of an interest of a debtor in property. Some heavily criticized decisions have held that such a noncollusive termination is indeed a transfer, and thus the termination can be subject to avoidance as a constructively fraudulent transfer or as a preference. Darby v. Atkinson (*In re* Ferris), 415 F. Supp. 33 (W.D. Okla. 1976); Fitzgerald v. Cheverie (*In re* Edward Harvey Co.*), 68 B.R. 851 (Bankr. D. Mass. 1987); Eder v. Queen City Grain, Inc. (*In re* Queen City Grain, Inc.), 51 B.R. 722, 726 (Bankr. S.D. Ohio 1985). Other courts have held that a noncollusive termination of a lease is not a transfer at all. *In re* Egyptian Bros. Donut, Inc., 190 B.R. 26, 30-31

(Bankr. D.N.J. 1995); Haines v. Regina C. Dixon Trust (*In re* Haines), 178 B.R. 471, 476 (Bankr. W.D. Mo. 1995).[13]

As noted by David B. Young, a perspicacious observer of these types of transactions:

> The most perceptive analyses of this question have concluded that lawful lease terminations are not subject to avoidance as preferences or fraudulent transfers, even though these transactions may be transfers in a strict sense. Undoubtedly the loss of a leasehold estate means parting with an interest in property held by the prepetition debtor. Such property, however, would not be available to creditors of the estate. Under 11 U.S.C. § 365(c)(3), the bankruptcy estate may not assume any executory contract or nonresidential lease that has been legitimately terminated prepetition. The estate would never have had any interest in the lease. If an "interest of the debtor in property" is synonymous with "property of the estate," then the correct approach is that noncollusive prepetition lease terminations cannot be preferential or fraudulent, not because they are not transfers, but rather because they do not involve a property interest of the debtor that would be available to the bankruptcy estate.

David B. Young, *Preferences and Fraudulent Transfers*, 876 PLI/COMM 667, 710 (2005).

As in the lease avoidance decisions, the focus here should be whether there was some interest of the debtor in property that was transferred, not whether the action will ultimately succeed. Here, the focus is on a warrant — a contract that undeniably creates property rights. The transfer of PP's interests in the warrant resulted in economic harm to PP — its ability to continue to use warrants as cash substitutes was affected. It also resulted in the cancellation of a right to receive the strike price as a condition for issuing any shares.

Avoidance of the warrant exchange could lead to creditor recoveries. Upon avoidance, AOL and PP would be returned to the status quo before the cancellation. Since AOL acquired its stock (which it later sold for a profit) under the terms of the Amended Warrant, an avoidance of that obligation would presumably allow PPLT to then seek, in restitution or otherwise, compensation for

---

[13]Section 8(e)(1) of the UFTA addresses this issue directly by explicitly providing that the lawful termination of a lease because of the debtor's default is not avoidable. *See* NRS § 112.220.5(a).

the value transferred.[14]   This theory of recovery provides additional grounds to distinguish *Decker* and *Curry & Sorensen*.  In those cases, avoidance would not have resulted in recovery to creditors; it would simply rearrange ownership interests.

Few would argue that an insolvent debtor's amendment of a contract to reduce the price of goods backed by adequate legal consideration, but for less than reasonably equivalent value, could be the subject of a fraudulent transfer attack.[15]   *See, e.g.*, Wallach v. Nowak (*In re* Sherlock Homes of W.N.Y., Inc.), 246 B.R. 19, 24-25 (Bankr. W.D.N.Y. 2000) (renegotiation of contract altering debtor's rights and liabilities is a transfer); Metro Water & Coffee Servs. v. Rochester Community Baseball (*In re* Metro Water & Coffee Servs.), 157 B.R. 742, 745-46 (Bankr. W.D.N.Y. 1993) (termination of a concession agreement).   That analysis does not change when the subject of the contract switches from tangible goods to intangible assets.   *See* United States v. Sims (*In re* Feiler), 218 F.3d 949 (9th Cir. 2000) (right to claim tax refund can be property subject to a transfer under Section 548).

Anticipating this point, TW asserts that the Original Warrant was "out of the money;" that is, its stated exercise or strike price was well above market, making the warrant economically worthless, and thus not property.  The issue thus framed is whether a right to receive a payment is still property when "worthless;" that is, when the conditions under which payment is to be made are, at best, remote.

---

[14]This is not unlike the fate of interest paid on an obligation later avoided as a fraudulent transfer; since the avoidance would eliminate the debt, no principal would remain upon which interest could accrue.  Accordingly, the estate could also recover the aggregate amount of interest payments, presumably under its inherited restitution powers under Section 541(a)(1) or, if the debtor was insolvent or nearly so, as independent fraudulent transfers.

[15]It is often said that a peppercorn will support the transfer of personal property by way of contract, *see* 2 WILLIAM BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 440 (1766).  While that may be true as between those in privity of contract, fraudulent transfer law deals with the rights of the creditors of those parties, and tests the adequacy of consideration against a much different scale.

Both TW and PPLT assert that there is no Nevada precedent on point, but the court believes that Union Bank v. F.D.I.C., 111 Nev. 951, 899 P.2d 564 (Nev. 1995) is of assistance.  There, a judgment creditor sought to garnish stock that was subject to a voluntary pledge under Article 9 of the Uniform Commercial Code.  The pledgeholder objected, stating that after satisfaction of all senior liens, there would be no value for the garnishing creditor, and hence no property right to which the garnishment could attach.  The Nevada Supreme Court rejected this claim, finding that there was some property interest to which the garnishment could attach, notwithstanding the lack of any economic interest.[16]  *See also* Segal v. Rochelle, 382 U.S. 375, 379 (1966) (declining to exclude the right to "net operating loss carry forwards" under tax law from definition of property merely because right was intangible and not yet reduced to a tax refund; the Court stated that "The main thrust of [§ 541's predecessor under the Act] is to secure for creditors everything of value the [debtor] may possess . . . . To this end the term property has been construed most generously and an interest is not outside its reach because is it novel or contingent or because its enjoyment must be postponed.").

Ninth Circuit precedent holding that elections with respect to net operating losses (NOLs) are interests in property that may be transferred is also instructive.  As analyzed by the Ninth Circuit:

> The first question as to the applicability of B.C. § 548 in this case is whether the election to forgo a tax refund and waive the carryback on the NOLs involved an "interest in property."  Because the right to receive a tax refund constitutes an interest in property, we believe that the election to waive the carryback and relinquish the right to a refund necessarily implicates a property interest.  Property is broadly defined by the Bankruptcy Code to include "all legal or equitable interests of the debtor."  B.C. § 541.  Furthermore, the Supreme Court has explained that "the term 'property' has been construed most generously and an interest is not outside its reach because it is novel or contingent or because enjoyment must be postponed." *Segal v. Rochelle*, 382 U.S. 375, 379, 86 S.Ct. 511, 15 L.Ed.2d 428 (1966).

United States v. Sims (*In re* Feiler), 218 F.3d 948, 955 (9th Cir. 2000).

---

[16]The court found an interest in the debtor's right to have an accounting of any disposition and to receive any surplus, rights that, given the over-encumbered nature of the stock, were as ephemeral and of as little value as the out-of-the-money status of the Original Warrant here. *See Union Bank*, 111 Nev. at 956-57, 899 P.2d at 567.

Here, the right to receive funds upon exercise of the Original Warrant was PP's property interest under the Original Warrant.  Under *Feiler,* the extinguishment of that right through cancellation of the Original Warrant and the issuance of the Amended Warrant was thus a transfer of an interest of the debtor in property.  The Ninth Circuit's logic in *Feiler* with respect to NOLs is equally applicable here:

> Whether the NOLs themselves are considered property is something of a red herring. Under B.C. § 548, the question is whether the Feilers gave up property of the estate. In this case, the property they gave up was the tax refund — the NOLs are simply an accounting method for figuring their entitlement to the refund under the present tax code.  Pre-election, the right to carry back the NOLs represented simply the right to a tax refund; as in *Segal*, the refund itself was the property interest.  After the election, whether the Feilers retained a property interest in the NOLs that were carried forward is irrelevant, because the trustee need not have a property interest in what the debtor receives in return for a fraudulent transfer in order to avoid the transfer.  B.C. § 548 avoidance powers apply to the interest in the property that the debtor gave up in the transfer — in this case, the tax refund associated with the right under the tax code to have the NOLs carried back.

*Id*. at 956.  Here, the right to receive any funds upon exercise is akin to the right to receive a tax refund, and the taking of an action to relinquish the rights thus identified — the election in *Feiler* and the warrant exchange here — is a transfer.

Finally, when construing "property" for purposes of the absolute priority rule, the Supreme Court has held that so-called "valueless" rights are still property, regardless of whether it is likely that they will be used.  *See* Bank of Am. Nat'l Trust & Sav. Ass'n v. 203 N. LaSalle St. P'ship, 526 U.S. 434 (1999) (referring to debtor's exclusive right to propose chapter 11 plan); Norwest Bank Worthington v. Ahlers, 485 U.S. 197 (1988) (farmer's retention of farm that had no economic value was property for purposes of absolute priority rule).

As a result, PP's exchange of warrant was a transfer of an interest of the debtor in property as required by Section 544(b) — PP's contract rights to receive payment, however contingent — were transferred away by virtue of the warrant exchange.  PPLT now has the daunting task of proving its fraudulent transfer scheme, which will be no mean feat, but any decision at present on that point would be premature.

E.    *PPLT Stock Subscription Argument — The Fourth Claim for Relief*

PPLT's second amended complaint adds a new fourth claim for relief under Nevada law for failure to perform as promised under a stock subscription agreement.  *See* NRS §§ 78.220, 78.225. In essence, PPLT maintains that the exercise of the warrant obligated AOL (and now TW) to provide the promised consideration required to exercise the option.  Because of the fraud, PPLT maintains that AOL did not furnish the full amount of the promised consideration.

This would appear to be no more or no less than a simple claim that one side has not performed as promised.  And such an allegation is sufficient under the statutes relied upon by PPLT. *See* NRS § 78.220.2 ("If default is made in the payment of any installment or call, the corporation may proceed to collect the amount due in the same manner as any debt due the corporation."); *id*. § 78.225 ("A purchaser of shares of stock from the corporation is not liable to the corporation or its creditors with respect to the shares, except to pay the consideration for which the shares were authorized to be issued . . . .").

It is appropriate to view PPLT's claim of non-performance under contract law.  It has long been held that upon proper and timely acceptance or exercise an option as such ceases to exist, and it becomes a simple contract.  Smith v. Post, 167 Cal. 69, 74-75, 138 P. 705, 707 (1914).  When AOL tendered its notice of exercise in the form of its "Net Issue Election," the transaction became a bilateral executory contract of purchase and sale under which the optionee — AOL — acquired an equitable interest in the shares simultaneously with an obligation to pay for them as specified.  *See In re* Merten, 164 B.R. 641, 643 (Bankr. S.D. Cal. 1994);  Ludy v. Zumwalt, 85 Cal. App. 119, 130-31, 259 P. 52, 56-57 (1927).

The complaint states that by virtue of the "acceptance of the Warrant Shares from Debtor. . . AOL agreed to pay for the Warrant Shares pursuant to the Amended Warrant."  It then alleges that notwithstanding the presentation of the Net Issue Election, "AOL failed to provide Debtor the agreed upon consideration . . ."  This would appear to state a rudimentary claim for breach of

19

1  contract, which would be sufficient to state a claim under Nevada's statutes requiring those who

2  promise to buy stock to pay what they promise.  *See* NRS §§ 78.220, 78.225.

3  TW argues that the claim of breach is not well-pleaded since it is contradicted by the terms

4  of the Amended Warrant.  Unfortunately for TW's position, the Amended Warrant is not attached to

5  the complaint, and thus the allegations in the complaint which make out PPLT's claim stand on their

6  own.  Even if they did not, the court's independent review of the Amended Warrant (provided by

7  PPLT in response to the motion, and not objected to by TW, *see* note 10 *supra*) does not disclose

8  anything that as a legal matter forbids characterizing the exercise as unperformed or imperfectly

9  performed, which is the heart of the fourth claim for relief.  Put another way, there is no showing

10  that PPLT would not be able to show, by appropriate parol or other evidence, that AOL's

11  submission of a "Net Exercise Notice" carried with it some sort of warranty or representation that

12  AOL was entitled to exercise the Amended Warrant because it had directed the requisite amounts of

13  revenue to PP.  Although this may be devilishly difficult to prove, it does make out a possible claim

14  for relief.  Accordingly, under *In re* Zimmer, 313 F.3d at 1222, the motion to dismiss is denied with

15  respect to the fourth claim for relief of action as well.

16  ### III. Conclusion

17  PPLT has alleged that at least one property right it held — its rights under the Original

18  Warrant —  was transferred in an exchange for the Amended Warrant.  The entire gravamen of

19  TW's motion to dismiss is that there was no transfer of an interest of the debtor in property.  As this

20  premise is not true, the conclusion of TW's motion — the court must dismiss the case — is false.

21  That, together with the other allegations in the complaint, settles the matter with respect to

22  the first three claims for relief.  As to the fourth claim for relief, as set forth above PPLT's claims

23  are sound, at least in form.

24  The motion to dismiss is thus denied.  The court will enter a separate order denying the

25  motion.

26  Copies sent to:

20

1   Gregory E Garman, Esq.
    Brigid M. Higgins, Esq.
2   Gordon & Silver, Ltd.
    3960 Howard Hughes Pkwy. 9th Floor
3   Las Vegas, NV 89109

4   Peter T. Barbur, Esq.
    Evan R. Chesler, Esq.
5   Rachel G. Skaistis, Esq.
    Cravath, Swaine & Moore, LLP
6   825 Eighth Avenue
    New York, NY 10019
7
    Todd L. Bice, Esq.
8   James D. Greene, Esq.
    Nikki L. Wilmer, Esq.
9   Schreck Brignone
    300 S. Fourth Street, Suite 1200
10  Las Vegas, NV 89101

11                                    # # #

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26